Filed 2/5/24  P. v. Gonzales CA2/5
Opinion following transfer from Supreme Court

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B313468 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA113372-01) |
| v. | |
| JUAN CARLOS GONZALES, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Jacqueline H. Lewis, Judge.  Affirmed in part, reversed in part and remanded with direction.

Richard D. Miggins, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill and David F. Glassman, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury found Juan Carlos Gonzales guilty of the murder of Nicholas Pletcher with true findings as to gang and firearm enhancement allegations.  Gonzales, who was 16 years old when he fatally shot Pletcher, was tried as an adult after the juvenile court found he was unfit for juvenile proceedings under Welfare & Institutions Code former section 707.[1]  In Gonzales's direct appeal, we reversed the gang enhancement finding and remanded for correction of the abstract of judgment but otherwise affirmed the judgment.

The California Supreme Court granted review.  It transferred the matter to this court and directed us to vacate our previous opinion and consider the impact on Gonzales's case of Assembly Bill (AB) 2361.  During the pendency of Gonzales's appeal, AB 2361 amended the requirements under section 707 for transfer of a matter from juvenile court to criminal court.  (Stats. 2022, ch. 330, § 1.)  Effective January 1, 2023, section 707 required the juvenile court to find by clear and convincing evidence (rather than by a preponderance of the evidence) that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court before it may transfer the case.  (*In re E.P.* (2023) 89 Cal.App.5th 409, 416.)

The parties agree AB 2361 applies retroactively to Gonzales's case because the case is not yet final.  (See *People v. Superior Court (Lara)* (2018) 4 Cal.5th 299, 303; *In re Estrada* (1965) 63 Cal.2d 740.)  We conditionally reverse the judgment and remand the matter for the juvenile court to conduct a new fitness hearing pursuant to the most current section 707

---

[1]     All further statutory references are to the Welfare & Institutions Code unless otherwise specified.

requirements for transfer of a case from juvenile court to criminal court. If, after the new fitness hearing, the juvenile court decides to retransfer the matter to criminal court, we give directions to the criminal court concerning further proceedings.

As to the other issues considered in our original opinion, we again reverse the gang enhancement and remand for correction of the abstract of judgment. Unlike our original opinion, we do not address appellant's ineffective assistance of counsel claim which he raised on appeal. The Supreme Court also granted review of our order denying appellant's habeas petition based on ineffective assistance of counsel. Pursuant to the high court's order, we issued an order to show cause, returnable before the Los Angeles County Superior Court on that issue. The ineffective assistance of counsel claim is currently pending in that court. Accordingly, for purposes of the present appeal only, appellant's ineffective assistance of counsel claim is moot.

### *FACTUAL AND PROCEDURAL BACKGROUND*

On August 21, 2016, Gonzales fatally shot the victim four times in an alley in Pomona. The District Attorney charged Gonzales with murder. (Pen. Code, § 187, subd. (a).) It was further alleged that Gonzales personally used and discharged a handgun (Pen. Code, § 12022.53, subds. (b), (c), (d)), that the offense was committed for the benefit of a criminal street gang, and that Gonzales was an active participant in the gang (Pen. Code, §§ 186.22, subd. (b)(1)(C) and 190.2, subd. (a)(22)).

Gonzales argued at trial that he acted in self-defense because the victim had previously threatened him and held a gun to his head twice. The prosecution's theory at trial was that Gonzales, a member of the 18th Street gang, shot the victim because the 18th Street gang wanted to control the sale of

narcotics in that area of Pomona.  The victim was a member of a tagging crew called HA or "High Artists," which claimed that territory and sold marijuana there.  The mother of the victim's children testified the victim appeared nervous and scared in the month before his death.

The People presented the following evidence:

## 1.    *Gonzales's Confession*

On August 25, 2016, Gonzales was arrested and interviewed by police.[2]  After initially denying any involvement in the shooting, Gonzales confessed:  "I got popped out twice by him . . . .  With a gun.  On my faith . . . he took my shit twice, mister.  Uh, this how it went down.  I pass through the park.  I was walking and then, all of a sudden, I go — I go through this, and I see him.  And he starts banging on me, like, 'Oh, you ain't from nowhere.  You're a little bitch.'  This and this.  And I was mad, mister.  I did have the burner.  I was mad.  Just — I couldn't do nothing about it.  [¶]  And then I was posted right there in the alley, and he comes up to me, like, 'Oh, you're a bitch.  What's up?  Give me — start giving me all your shit.'  Like, he tried to tax me, and I got scared of him, you know.  Straight up.  I got scared.  Pulled it out, mister.  Started popping.  Straight up."

Gonzales explained the victim had twice previously put a gun to his head and he did not want to go through that again.  On the day of the shooting, Gonzales believed the victim was reaching for a gun because he saw the victim reaching in his

---

[2]    Portions of the recorded interview were played to the jury, and a transcript of it was admitted into evidence.

pocket.[3] When the victim walked up close to Gonzales, Gonzales "just got scared and just popped it out." He admitted he shot the victim three or four times. He also stated "Richard" was with him.

### 2. *Richard Guerrero's Testimony*

Richard Guerrero had known Gonzales since middle school and knew Gonzales's street name was Polar. Guerrero testified that Gonzales told him he did not like the victim. On the day of the shooting, Guerrero was smoking marijuana with a friend in a park when the two of them heard the sound of gunfire. Guerrero and his friend immediately got up. Guerrero was curious to see what happened, so he ran towards the sound while his friend left the park.[4]

Guerrero came upon Gonzales and the victim in a nearby alley. Guerrero heard the victim say to someone on the phone, "Danny, come as quick as possible and bring the burner." Guerrero understood "burner" to mean a gun. Guerrero then saw Gonzales shoot the victim twice a few seconds after that phone call. The victim screamed and fell to the ground. The gun then

---

[3] No guns were recovered from the alley or from the victim's body. A can of spray paint was found in the victim's right front pocket and a bottle of cologne in his right back pocket.

[4] Guerrero's trial testimony differed somewhat from what he told the police shortly after the shooting. In the police interview, he stated he walked to the alley, not with a "friend," but with Gonzales. Guerrero neither mentioned the park nor his friend. The prosecutor refreshed his recollection at trial with his statements to the police, which Guerrero then adopted as his testimony. Guerrero also admitted he first heard a gunshot when he was near the alley, not while he was at the park.

5

appeared to jam. Gonzales kicked the victim. After fixing the gun, Gonzales approached within inches of the victim and shot him in the head. Afterwards, Gonzales said to the victim, "18, bitch."

Surveillance video showed Gonzales and Guerrero walking away from the alley shortly after the shooting. They hid in a vacant house for a few minutes when they thought a white van was following them. Gonzales asked Guerrero to hold and hide the gun for him, but Guerrero refused. They ended up at Gonzales's house, where they smoked marijuana for two hours. Gonzales told Guerrero he shot the victim because "it was business." When pressed by the prosecutor about what that meant, Guerrero said, "Just business. Personal business." The prosecutor then asked, "Gang business?" And Guerrero replied, "that's what I thought."

Guerrero explained that he sometimes bought marijuana from Gonzales. Although he did not know Gonzales sold drugs for the 18th Street gang, he knew Gonzales associated with them. He also knew the 18th Street gang wanted to control drug sales in that area of Pomona.

### 3. Ballistics Evidence

The medical examiner testified the victim had four gunshot wounds: one to the back of his head, which was fatal; a second to the right side of his abdomen, which was also fatal; a third to his left hip region, which was potentially fatal; and a fourth to the area near his torso, abdomen, neck, and right arm, which caused superficial non-fatal injuries.

Police found seven .380-caliber cartridge casings; four were recovered near the victim's body and three were located further away, near the mouth of the alley. Three bullets or bullet

6

fragments were also recovered at the scene of the crime. In a search of Gonzales's home four days after the killing, police recovered inside a dresser drawer a .380 semi-automatic handgun manufactured by Lorcin, and an empty magazine underneath the mattress. The firearms expert stated that four of the seven cartridge casings she examined from the crime scene were fired from the Lorcin .380 handgun.

## 4. *Facebook Evidence*

Police obtained a search warrant to access Gonzales's Facebook account. They recovered a photograph, "authored" by Gonzales, of a face with the number "18" under the left eye. In a Facebook message dated August 22, 2016, someone with the username "Tony Montana" messaged Gonzales, "LOL, finally Dazer [victim Fletcher] is dead." Gonzales replied, "Ha, ha, ha, ha." Later, Gonzales messaged Montana, "Have you heard?" Montana responded, "Yep. I heard. So who is next target to get smoke?"[5] Gonzales responded, "IDK."[6] The next day, Montana messaged, "Yo. Someone snitching on you guys. Keep low key." To this, Gonzales stated, "What did we do?" and "I want to know who smoked Dazer."

## 5. *Gang Evidence*

Los Angeles Police Department Detective Arthur Castro testified he was assigned to the FBI gang task force to monitor the 18th Street gang. Castro provided a summary of the 18th Street gang's history, its territory, and its cliques and subsets.

---

[5] The homicide detective investigating the case testified "who is next to get smoke" means who is next to be shot or killed.

[6] The homicide detective who testified about the message stated that "IDK" means "I don't know."

He described the gang tattoos as including an "18," a big "E," and "13." He identified the 18th Street hand sign as an "E" and the primary colors as navy or dark blue. Detective Castro listed the primary activities of 18th Street as murder, violent acts, shootings, robberies, burglaries, narcotics sales, and extortion. He said 18th Street was involved in everything from selling narcotics to vandalism. He also described the hierarchy of gangs and the 18th Street gang's allegiance to the Mexican Mafia and what that entailed, including paying rent to the shot caller.

Castro testified he had conducted two or three investigations involving violent crimes committed by 18th Street gang members against a tagging crew or low-level drug dealer to take control of an area. He stated the 18th Street gang sometimes absorbed the crew into its organization.

Although Detective Castro had no prior personal contact with Gonzales, he confirmed Gonzales's tattoos showed allegiance to the Mexican Mafia and included 18th Street gang symbols. It was Castro's opinion that Gonzales murdered the victim to benefit the 18th Street gang. Pomona Police Department Detective Richard Machado and LAPD Officer Daniel Garcia testified to predicate cases involving 18th Street gang members to prove the gang enhancement. We discuss their testimony in detail below.

6. *Expert Reports*

In 2017, Dr. Ronald Markman evaluated Gonzales and prepared a report that concluded: "Minor appears to have acted impulsively, in a highly emotional state, without any thoughtful consideration, feeling threatened by someone who had previously been aggressive towards him, and fearing for his life. However, he was capable of forming the intent to kill, distinguishing

between right and wrong and premeditating, but his emotional state likely precluded an ability to deliberate, leading to this tragic event." Dr. Markman noted testing revealed an "individual with a suspicious, impulsive and emotional potential to act out thoughtlessly."

In 2021, Dr. Francesca Lehman evaluated Gonzales. Dr. Lehman agreed with Dr. Markman that Gonzales "acted impulsively, in a highly emotional state, without any thoughtful consideration in the instant offense." Dr. Lehman further described the continuing brain development in youths which result in youthful impetuosity.

On October 21, 2020, the court held a pretrial hearing during which the prosecutor moved to exclude any mention of Gonzales's age (he was 16 years old at the time of the shooting) at trial. The prosecutor argued his age was irrelevant to the proceedings. The prosecutor noted that Gonzales was initially charged as an adult but the matter was transferred to juvenile court after the passage of Proposition 57.[7] The juvenile court found Gonzales unfit for juvenile proceedings and the matter was transferred back to criminal court. Gonzales was 20 years old at the time of trial.

Gonzales's trial attorney initially opposed the motion to exclude: "I do think it's very relevant. Developmental stages of teens [are] different than the mindset and the development of an adult. And I think it's important that a jury knows the age of my

---

[7] Proposition 57 required prosecutors to commence all cases involving a minor in juvenile court but allowed prosecutors to transfer a minor 16 years or older who is charged with a listed offense to adult criminal court. (*O.G. v. Superior Court* (2021) 11 Cal.5th 82, 87; see former § 707, subd. (a)(1)–(2).)

9

client at the time of the crimes in order to take that into consideration when determining any type of mindset needed as an element of the crime."

The prosecutor countered that "unless the defense is going to call experts to opine or testify that the minor's age and brain development at the time weighed on his ability to form the necessary specific intent to commit murder, I would make the same objection, that any of that testimony is irrelevant. [¶] Nothing in the elements of the charged account require us to prove that a minor had any different specific intent than an adult would in this particular crime."

When the court asked whether defense counsel intended to call any experts to testify to that effect, she responded, "No, I'm not. Perhaps for sentencing, but not for the case in chief." The court then granted the prosecution's motion that Gonzales's age not be mentioned at trial.

### 7. *The Verdict and Sentence*

The jury found Gonzales guilty of first degree murder and found each of the firearm and gang enhancements true. The trial court sentenced Gonzales to 50 years to life, comprised of a 25-years-to-life term for the murder conviction plus another 25-years-to-life term for the firearm enhancement under subdivision (d) of Penal Code section 12022.53. The remaining sentence enhancements were stayed pursuant to Penal Code section 654. Gonzales appealed.

### 8. *The Direct Appeal*

We reversed the gang enhancement finding and remanded the matter for further proceedings if the prosecution were to decide to retry Gonzales on the gang allegations, observing that the sentence on the gang enhancement had been stayed pursuant

10

to section 654.  We also directed the trial court to correct an error in the abstract of judgment.  We otherwise affirmed the judgment.

Gonzales filed a petition for rehearing which raised a new issue:  the impact on his case of AB 2361, which sets standards for whether a juvenile should be tried in juvenile or adult criminal court.  Gonzales explained his appellate counsel failed to raise the issue because the amendments to section 707 made by AB 2361 were not in effect at the time of briefing. In the interim, the new law went into effect.  We summarily denied Gonzales's petition for rehearing, and Gonzales sought review from the California Supreme Court.  On September 20, 2023, the high court granted the petition for review and transferred the matter to this court "with directions to vacate its decision and reconsider the cause in light of Assembly Bill No. 2361 (Stats. 2022, ch. 330). (Cal. Rules of Court, rule 8.528 (d).)"

The parties filed supplemental briefing pursuant to California Rules of Court, rule 8.200(b).  They agree AB 2361 applies retroactively to Gonzales's case.  The People argue there is no need for remand for a new section 707 hearing because it is not reasonably probable a juvenile court would deny transfer under the new standard of proof.  The People rely on the harmless error analysis articulated in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).  Gonzales counters that there is no "error" to correct.  Rather, the juvenile court must be given the opportunity to make its ruling based on the higher burden of proof under the new law, and "neither respondent nor this Court hav[e] the prescience to predict how the Juvenile Court will rule when applying a new standard."

11

## *DISCUSSION*

We first address the Supreme Court's order to reconsider the cause in light of AB 2361.  Because the Supreme Court additionally directed that our previous decision be vacated, we then repeat our analysis and conclusions regarding the gang enhancement issue and error in the abstract of judgment.

1. ***The Matter is Remanded for the Juvenile Court to Conduct a Fitness Hearing Pursuant to Amended Section 707***

A.     Applicable Law

Effective January 1, 2023, section 707, subdivision (a)(3), provides that to "find that the minor should be transferred to a court of criminal jurisdiction, the court shall find by clear and convincing evidence that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court." In making its decision, the court shall consider the following five criteria:  (A) "The degree of criminal sophistication exhibited by the minor," (B) "Whether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction," (C) "The minor's previous delinquent history," (D) "Success of previous attempts by the juvenile court to rehabilitate the minor," and (E) "The circumstances and gravity of the offense alleged in the petition to have been committed by the minor."  (§ 707, subd. (a)(3)(A)–(E).)

"If the court orders a transfer of jurisdiction, the court shall recite the basis for its decision in an order entered upon the minutes, which shall include the reasons supporting the court's finding that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court."  (§ 707, subd. (a)(3).)

12

In *In re T.A.* (2023) 90 Cal.App.5th 347, 352–356, review granted July 26, 2023, S279635, the court considered the same issue presented here.[8]  There, the defendant minor was tried and convicted as an adult for murder.  The Court of Appeal conditionally reversed the judgment and remanded for a transfer hearing in light of Proposition 57, the previous amendment to section 707.  On remand, the juvenile court granted the People's motion to transfer the defendant back to criminal court and reinstate the judgment.  Seven months later, during the defendant's second appeal, AB 2361 went into effect, further amending section 707.  (*In re T.A.*, at p. 45.)  The Court of Appeal applied the *Watson* harmless error test to find it was not reasonably probable the juvenile court would have reached a different decision under the then-applicable clear and convincing standard of proof.  (*Id.* at p. 48.)  The defendant sought review in the Supreme Court.

The Supreme Court granted review and then re-transferred the case to the Court of Appeal with directions to vacate its decision and "reconsider the cause in light of *In re F.M.* (2023) 14 Cal.5th 701, 712–716 [307 Cal.Rptr.3d 589, 528 P.3d 19] and *In re E.P.* (2023) 89 Cal.App.5th 409, 416 [305 Cal.Rptr.3d 838] ['under the previous version whether the minor is amenable to rehabilitation while under the jurisdiction of the juvenile court

---

[8]  Although the Court of Appeal opinion in *In re T.A.* was initially published, the Supreme Court ordered the opinion depublished when it granted review and ordered the matter transferred back to the Court of Appeal.  (*In re T.A.* (July 26, 2023, S279635) 532 P.3d 732.)  We do not cite *In re T.A., supra,* 307 Cal.Rptr.3d for precedential effect but only to provide context for the Supreme Court's transfer order.  (Cal. Rules of Court, rule 8.1115(e).)

was one of five factors for the court to consider in determining whether the case should be transferred to criminal court. The amendment states it as the ultimate question for the court to decide']. (Cal. Rules of Court, rule 8.528(d).)" (*In re T.A.*, *supra*, 532 P.3d 732, 733.)

In the *In re T.A.* transfer order, the Supreme Court directed the Court of Appeal to specific pages of its prior *In re F.M.* opinion. At those pages, the Supreme Court determined that remand was necessary for a juvenile court to exercise its discretion "unless the record as a whole establishes that the juvenile court 'was aware of, and exercised its discretion . . . .'" (*In re F.M.*, *supra*, 14 Cal.5th at p. 712.)[9] The court rejected the People's position that the harmless error standard under *Watson* applied, concluding the standard "does not address the risk of courts misapprehending the extent of their lawful authority in this particular context." (*Id.* at p. 716.) The court reasoned, "where the concern is that no discretionary decision was made, attempting to discern the likelihood of a 'more favorable' decision is a more speculative inquiry. Instead of hypothesizing what decision the juvenile court would have made if it had understood the extent of its lawful authority, reviewing courts have consistently held that remand is appropriate in these circumstances." (*Ibid.*)

---

[9] The issue before the Supreme Court in *In re F.M.* had nothing to do with whether a juvenile should or should not be tried in adult criminal court. Instead, it dealt with the juvenile court's failure to comply with section 702, which requires the trial court upon adjudication to declare whether a sustained wobbler offense is a felony or a misdemeanor. Unless the court had exercised its discretion, remand to the juvenile court was necessary. (*In re F.M.*, *supra*, 14 Cal.5th at p. 712.)

14

In *In re E.P., supra,* 89 Cal.App.5th at page 416, the second case cited by the Supreme Court in its *In re T.A.* transfer order, the Court of Appeal remanded the matter for a new fitness hearing under amended section 707. *In re E.P.* identified the three differences between the previous and amended versions of section 707: "First, in the previous version of section 707, the prosecution's burden was by a preponderance of the evidence. Under the amendment the prosecution's burden is increased to clear and convincing evidence.

"Second, under the previous version whether the minor is amenable to rehabilitation while under the jurisdiction of the juvenile court was one of five factors for the court to consider in determining whether the case should be transferred to criminal court. The amendment states it as the ultimate question for the court to decide. Nevertheless, in deciding that question, the amendment requires the court to consider the same five factors listed in the previous version.

"Finally, the previous version required that if the juvenile court orders a transfer, it shall recite the basis for its decision in the order. The amended statute requires the court to not only recite the basis for its decision, but also the reasons supporting the court's finding that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court." (*In re E.P., supra,* 89 Cal.App.5th at p. 416.)

The *In re E.P.* court concluded remand was necessary for the juvenile court to consider all five factors together to make the ultimate determination as to whether the minor was amenable to rehabilitation. (*In re E.P., supra,* 89 Cal.App.5th at p. 417.)

B.     Analysis

Applying *In re F.M.* and *In re E.P.*, we remand the matter for the juvenile court to conduct a new fitness hearing under section 707.  At the time of the initial Proposition 57 fitness hearing, the juvenile court was not aware of the obligation to consider whether clear and convincing evidence showed that Gonzales was not amenable to rehabilitation.  Nor was the juvenile court aware that the ultimate question for it to decide was whether the juvenile was amenable to rehabilitation; in the previous version of section 707, whether a minor was amenable to rehabilitation was only *one* factor to consider.  Finally, the prior statute did not require the juvenile court to state "the reasons supporting the court's finding that the minor is not amenable to rehabilitation," which was added in the amended statute.[10]

As the court did in *In re F.M.*, we reject the People's argument that we should apply a harmless error analysis to determine whether it is reasonably probable the juvenile court would have reached a different decision.  It is clear the juvenile court did not exercise its discretion under a clear and convincing standard nor could it have been aware that amenability to rehabilitation was the ultimate fact for the court to decide, not one of several factors.  The remedy in our Supreme Court's words is that:  "Instead of hypothesizing what decision the juvenile court would have made if it had understood the extent of its

---

[10]     Section 707 was again amended effective January 1, 2024. (Sen. Bill No. 545 (2023-2024 1st Ex. Sess.) § 1.)  On remand, the juvenile court must comply with the most current version of section 707.  However, the 2024 amendments do not affect our analysis in this opinion.

16

lawful authority," (*In re F.M.*, *supra*, 14 Cal.5th at p. 716), we hold that "remand is appropriate in these circumstances." (*Ibid.*)

**2.** ***The Gang Finding Under Penal Code Former Section 186.22 is Supported by Substantial Evidence but That Evidence Does Not Meet the Requirements Under the Amended Statute; Remand is Necessary***

On direct appeal, Gonzales argued the evidence was insufficient to support a true finding as to the gang allegation under Penal Code former section 186.22 as Penal Code section 186.22 is amended by Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Stats. 2021, ch. 699) (AB 333).[11] We found substantial evidence supported the jury's gang finding under the statute in effect at the time of the trial. We concluded reversal of the gang finding was nevertheless necessary because of the changes made by AB 333.[12]

---

[11] Gonzales also contends his trial counsel was deficient because she failed to argue to the jury that there was insufficient evidence to support the gang enhancement. Given the ample evidence submitted by the People to prove the gang enhancement, as a matter of trial strategy, defense counsel could reasonably have decided instead to focus her closing argument on self-defense. (See *People v. Carter* (2003) 30 Cal.4th 1166, 1211 ["A reviewing court will indulge in a presumption that counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy."].)

[12] We observe that a reversal of the gang enhancement does not reduce the sentence Gonzales is currently serving. The trial court sentenced Gonzales to 50 years to life, comprised of a 25-years-to-life term for the murder conviction plus another 25-

17

The standard of appellate review for determining the sufficiency of the evidence supporting an enhancement is the same as that applied to a conviction—that is, we review the entire record in the light most favorable to the People and determine whether any rational fact finder could have found the essential elements of the crime beyond a reasonable doubt. (*People v. Wilson* (2008) 44 Cal.4th 758, 806; *People v. Mejia* (2012) 211 Cal.App.4th 586, 614.) Given this standard of review, we begin by setting out the evidence presented by the prosecution in support of the gang allegation.

    *A.    Gang and Predicate Offense Testimony*

As we have discussed, Detective Castro testified to the primary activities, common name, and common identifying signs and symbols of the 18th Street gang. He also identified Gonzales as a member of the 18th Street gang from his tattoos and social media.

Detective Machado testified to arresting Steven Ray Palma, known as "G Money" and a self-identified member of the 18th Street gang, for being a felon in possession of firearms on June 19, 2013.

Officer Garcia testified to his background, training, education, and experience as it related to criminal street gangs, specifically the 18th Street gang. Officer Garcia had previously

---

years-to-life term for the firearm enhancement under subdivision (d) of section 12022.53. The trial court imposed and stayed the gang enhancement pursuant to Penal Code section 654. Gonzales thus must still serve a 50-years-to-life term even if the gang enhancement were stricken. Although a reversal has no practical effect on Gonzales's current sentence, we nevertheless address his argument because the sentence on the gang enhancement was imposed (although stayed).

testified as the gang expert in two cases involving 18th Street gang members:  Jose Luis Munoz, an 18th Street gang member known as "Diablo," was convicted of an August 12, 2011 murder and 18th Street gang members Roberto Epifanio Sanchez, Carlos Numberto Morales, Philip Joseph Jojola, and Arthur John Quesada were convicted of conspiracy to commit murder and attempted murder occurring on July 7, 2012.  Garcia also testified as the gang expert in a case involving Clique 54 members, which he identified as a subset of the 18th Street gang.  In that case, Julio Cesar Reyes, Daniel Alonzo Martinez, and Eric Sailor were convicted of a June 20, 2014 murder.

> B.  *The Evidence Was Sufficient to Establish the Gang Enhancement in Effect Prior to the AB 333 Amendments*

We first discuss Gonzales's sufficiency of the evidence argument because if the evidence was insufficient to meet the requirements of the statute at the time of trial, there can be no retrial.  (*People v. Vasquez* (2022) 74 Cal.App.5th 1021, 1033.)  An error based solely on AB 333 permits a retrial if the prosecution so chooses.

At the time Gonzales was tried, the prosecution was required to prove the defendant committed the offense "for the benefit of, at the direction of, or in association with a criminal street gang" in order to establish the gang enhancement.  (Pen. Code, former § 186.22, subd. (b)(1).)  A "criminal street gang" was defined as an ongoing association or group of three or more persons, having as one of its primary activities the commission of certain criminal acts, "having a common name or common identifying sign or symbol," and whose members have engaged in a "pattern of criminal gang activity."  (Pen. Code, former

19

§ 186.22, subd. (f).)  A "pattern of criminal gang activity" in turn, meant the commission of "two or more" statutorily listed offenses. (Pen. Code, former § 186.22, subd. (e)(1).)

Here, the prosecution presented evidence that Gonzales portrayed himself as an 18th Street gang member on social media and had tattoos indicating his allegiance to the 18th Street gang. Guerrero testified Gonzales associated with the 18th Street gang and said, "18, bitch" immediately after shooting the victim. Gonzales later told Guerrero he shot the victim because "it was business."  Gonzales and Detective Castro testified to the 18th Street gang's intention to control the sale of narcotics in areas of Pomona.  Based on his experience and a hypothetical mirroring the facts of this case, Castro testified that in his opinion the victim's murder was committed to benefit the 18th Street gang.

As to whether the 18th Street gang was a criminal street gang engaged in a pattern of criminal gang activity, Detective Castro testified to the primary activities, common name, and common identifying signs and symbols of the 18th Street gang. Officer Garcia described the predicate offenses that had been committed by members of the 18th Street gang, including a 2011 murder by an 18th Street gang member and a 2012 conspiracy to commit murder and attempted murder by four 18th Street gang members.  At the time of the trial, there were no temporal limits on the date on which a predicate offense occurred.  (This changed under the AB 333 amendments.)  This is sufficient to support a true finding on the gang enhancement under the former statute.

C.     *The People Failed to Produce Sufficient Evidence of a Gang Enhancement Under AB 333*

During the pendency of this appeal, the Legislature enacted AB 333, which took effect on January 1, 2022.  The

parties agree AB 333 applies retroactively to Gonzales's case. The Supreme Court confirmed the parties' position. (*People v. Tran* (2022) 13 Cal.5th 1169, 1207.) Gonzales contends the People failed to present evidence to meet the new requirements under AB 333 for predicate offenses. Although the Attorney General does not counter Gonzales's argument, he nevertheless asks us to affirm the judgment without explaining why affirmance is appropriate under these circumstances. As we discuss next, we conclude reversal and remand for further proceedings is proper.

   (1) AB 333

  Both before and after its amendment by AB 333, Penal Code section 186.22 applied only to a defendant who committed a felony "for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in" criminal conduct by gang members. (Pen. Code, § 186.22, subd. (b)(1).) AB 333 added a new definition, explaining, "to benefit, promote, further, or assist means to provide a common benefit to members of a gang where the common benefit is more than reputational. Examples of a common benefit that are more than reputational may include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant." (Pen. Code, § 186.22, subd. (g).)

  AB 333 also changed the requirements for predicate offenses. AB 333 amended section 186.22's definition of "criminal street gang" to require that members collectively (no longer individually or collectively) engage in a pattern of criminal gang activity. (Pen. Code, § 186.22, subd. (f).) Now, to establish a

21

"pattern of criminal activity," the prosecution must show the commission of two or more enumerated offenses, "provided at least one of these offenses occurred after the effective date of this chapter, and the last of those offenses occurred within three years of the prior offense and within three years of the date the current offense is alleged to have been committed, the offenses were committed on separate occasions or by two or more members, the offenses commonly benefited a criminal street gang, and the common benefit of the offense is more than reputational."[13]  (Pen. Code, § 186.22, subd. (e)(1).)

        (2)     Analysis

Gonzales contends the People failed to prove the elements of the amended statute.  The Attorney General does not dispute the lack of evidence.

At trial, the People presented evidence of four predicate offenses:  (1) a 2011 murder by an 18th Street gang member known as Diablo, (2) a 2012 conspiracy to commit murder and attempted murder by four 18th Street gang members, (3) a 2013 arrest of an 18th Street gang member known as G-Money for

---

[13]     We observe that Gonzales misreads the amended statute; he asserts "the predicate offenses could not have occurred prior to August 21, 2013," which is three years before the current offense. Penal Code section 186.22, subdivision (e)(1) specifies that only one of the predicate offenses need occur within three years of the current offense and the second, earlier predicate offense must occur within three years of the later predicate offense (not within three years of the current offense).

22

being a felon in possession of a firearm, and (4) a 2014 murder committed by members of Clique 54.[14]

*__The 2011, 2012 and 2013 crimes__*. The evidence presented to the jury did not demonstrate the predicate offenses "commonly benefited a criminal street gang" where the "common benefit . . . is more than reputational." (Pen. Code, former § 186.22, subd. (e)(1).) In the 2011 offense, the 18th Street gang member shot a motorist who he believed was following him after a fight. There is no indication that the shooting or the initial fight was gang related, much less that it benefited the 18th Street gang. In the 2013 offense for being a felon in possession of two firearms, there was no testimony that G Money possessed the firearms for gang-related activities rather than for personal protection.

The evidence concerning the 2012 crime also did not demonstrate a common benefit to the 18th Street gang. Officer Garcia summarized the 2012 offense as follows: "[The defendant gang members] meet a victim. The victim tells them where to buy narcotics. So the victim takes them there. They end up being stopped, all of them. So they blamed — these four blamed the victim for taking them to a hot place, which is raided by police. [¶] So from there, they take him to a house in Baldwin Park. They held the victim hostage, asked the girlfriend to get some money, like a ransom. [¶] The girlfriend doesn't come up with the ransom. Mr. Carlos Morales takes him to San Dimas, shoots him, but the victim survives." There is nothing in the

---

[14]    In addition to the officers' testimony regarding the predicate offenses, the People admitted into evidence the minute orders in each of the cases. The minute orders do not disclose any further information pertinent to the gang enhancement inquiry beyond the testimony.

23

summary that indicates the attempted murder was connected to the 18th Street gang, aside from the fact that the defendants were members of the gang.  Garcia did not testify the four were looking to acquire drugs for the gang rather than for personal use.

 ***The 2014 crime.***  Although the parties do not argue the point, it appears the evidence is also insufficient to support a finding that the 2014 offense was committed to benefit the 18th Street gang rather than only Clique 54.  *In People v. Prunty* (2015) 62 Cal.4th 59, 67 (*Prunty*), the Supreme Court held, "when the prosecution seeks to prove the street gang enhancement by showing a defendant committed a felony to benefit a given gang, but establishes the commission of the required predicate offenses with evidence of crimes committed by members of the gang's alleged subsets, it must prove a connection between the gang and the subsets."  Neither party cites to or addresses *Prunty*, much less discusses whether the evidence presented at trial proved a connection between the 18th Street gang and Clique 54 beyond the bare conclusion that one was a subset of the other.  *Prunty* tells us that is not enough to satisfy Penal Code section 186.22's definition of a "criminal street gang."  (*Ibid.*)  Even if we assume the 2014 offense meets the AB 333 requirements — it occurred within three years of the current offense, it involved collective action, and the common benefit was more than reputational in that the perpetrators killed a gang rival — one predicate offense is not sufficient to establish a pattern of criminal activity under Penal Code section 186.22, subdivisions (e) & (f).

Given the state of the evidence of the four predicate crimes, we reverse the gang enhancement.[15]  The prosecution may elect to retry the enhancement if it chooses.

### 3.    *The Abstract of Judgment Must be Corrected*

Gonzales points out the abstract of judgment incorrectly lists the applicable code section for his murder conviction as Penal Code section 245, subdivision (a)(1).  The murder conviction was pursuant to Penal Code section 187, subdivision (a), not section 245, which describes the crime of assault with a deadly weapon.  On remand the trial court shall correct the abstract.

### *DISPOSITION*

The matter is conditionally reversed and remanded to the juvenile court with directions to conduct a fitness hearing pursuant to the version of section 707 currently in effect.  If the juvenile court determines that transfer to adult criminal court is not appropriate under the amended law, the court shall conduct further proceedings in juvenile court.  If the juvenile court determines that transfer to criminal court is appropriate under the amended law, the juvenile court shall retransfer the matter to criminal court, where the prosecution shall elect whether to retry defendant on the gang enhancement allegations.  If the prosecution chooses not to retry the gang enhancement, the court shall prepare an amended abstract of judgment correcting the

---

[15]    Because we find the common benefit requirement under AB 333 has not been met, we need not address whether the predicate crimes involved collective action.  (*People v. Delgado* (2022) 74 Cal.App.5th 1067, 1088–1089; *People v. Lopez* (2021) 73 Cal.App.5th 327, 344–345; contra, *People v. Clark* (2022) 81 Cal.App.5th 133, 145, review granted Oct. 19, 2022, S275746.)

25

citation to the murder conviction to Penal Code section 187, subdivision (a) and striking the imposition of a 25-years-to-life sentence for the gang enhancement (which is presently stayed pursuant to section 654).  The trial court is directed to forward a certified copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.



RUBIN, P. J.

I CONCUR:



MOOR, J.

The People v. Juan Carlos Gonzales
B313468


BAKER, J., Concurring in Part and Dissenting in Part



I join the holdings in Parts 2 and 3 of the Discussion section of the opinion for the court, which I previously joined before our Supreme Court directed us to vacate our prior opinion and reconsider the cause in light of Assembly Bill No. 2361 (2021-2022 Reg. Sess.) (AB 2361).

I do not join, however, Part 1 of the Discussion section, which analyzes the AB 2361 issue. That is because we have no record of what transpired at the Welfare and Institutions Code section 707 hearing that led to defendant and appellant Juan Gonzales's (defendant's) transfer to a court of criminal jurisdiction. Trial and juvenile court judges sometimes make remarks concerning the strength of the evidence presented on one point or another, and it is possible the court here made comments that we might find prescient concerning the change in law that would later be worked by AB 2361 (e.g., "Given the strength of the evidence, I would transfer this defendant to a court of criminal jurisdiction even if the standard were beyond a reasonable doubt"). If the transferring judge made a comment along these lines, I think the answer to the question of whether harmless error review is appropriate in this case might be quite different than the one given by the majority.

I would therefore order the record augmented with the reporter's transcript of the transfer hearing on our own motion before resolving this appeal.  We cannot responsibly decide the AB 2361 issue without it.



BAKER, J.